```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON


_____x
                              :
UNITED STATES OF AMERICA,      :         Criminal Action
                              :
           Plaintiff,          :         No.  2:12-cr-000154
                              :
v.                            :
                              :         Date:  November 15, 2012
THOMAS RAMEY, JR.,             :
                              :
           Defendant.          :
_____x


            TRANSCRIPT OF SENTENCING HEARING HELD
      BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
              UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA STEVEN R. RUBY
                           AUSA THOMAS C. RYAN
                           U.S. Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713


For the Defendant:         GREGORY J. CAMPBELL, ESQ.
                           BRADY CAMPBELL, ESQ.
                           Campbell Law Offices
                           1412 Kanawha Boulevard, East
                           Charleston, WV 25301


Probation Officer:         Lee Cueva


Court Reporter:            Ayme Cochran, RPR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1        PROCEEDINGS had before The Honorable Thomas E. Johnston,

2   Judge, United States District Court, Southern District of West

3   Virginia, in Charleston, West Virginia, on November 15, 2012, at

4   2:06 p.m., as follows:

5            COURTROOM DEPUTY CLERK:  The matter before the Court is

6   the United States versus Thomas Ramey, Jr., criminal action

7   number 2:12-154, scheduled for sentencing.

8            THE COURT:  Good afternoon.  Will counsel please note

9   their appearances?

10           MR. RUBY:  Good afternoon, Your Honor.  Steve Ruby and

11  Thomas Ryan for the United States, and with us at counsel table

12  is Special Agent Todd Berry of the FBI.

13           MR. G. CAMPBELL:  Judge, Gregory Campbell for the

14  defendant, Thomas Ramey, who is present here in the courtroom,

15  and also assisting me is my son, Brady Campbell, who has just

16  been admitted to this Court.

17           THE COURT:  Mr. Campbell, welcome.

18           MR. B. CAMPBELL:  Thank you.

19           THE COURT:  Will the defendant please stand?

20      I'll ask the deputy clerk now to administer an oath to the

21  defendant.

22           COURTROOM DEPUTY CLERK:  Please raise your right hand.

23           **THOMAS RAMEY, JR., DEFENDANT, SWORN**

24           COURTROOM DEPUTY CLERK:  Thank you.

25           THE COURT:  You may be seated.

1    Mr. Ramey, do you understand that you are now under oath and

2 you must tell the truth and, if you testify falsely, you may face

3 prosecution for perjury or for making a false statement?

4    THE DEFENDANT:  Yes, Your Honor.

5    THE COURT:  All right.  And throughout the course of

6 this hearing, if there's anything that occurs that you don't

7 understand, I want you to feel free to speak up and seek

8 clarification.

9    Also, if at any time you need to confer with your attorneys,

10 I'll be pleased to pause the proceedings to allow you to do so.

11 Do you understand all that?

12    THE DEFENDANT:  Yes, sir.

13    THE COURT:  All right.  As I recall from the plea

14 hearing, I deferred a finding on a factual basis.  Having now

15 reviewed the record, I am now prepared to find that there is a

16 basis in fact for the tendered plea in this case and that the

17 elements of the crime charged in the information have been

18 established.

19    Mr. Campbell, have you received and read and reviewed with

20 your client a copy of the Presentence Report?

21    MR. G. CAMPBELL:  Yes, Your Honor.

22    THE COURT:  And, Mr. Ramey, have you received and read

23 and reviewed with your counsel a copy of the Presentence Report?

24    THE DEFENDANT:  Yes, Your Honor.

25    THE COURT:  And, Mr. Ruby or Mr. Ryan, have you all

1    received the Presentence Report?

2             MR. RUBY:  We have, Your Honor.

3             THE COURT:  Very well.  I note that a number of, at

4    times, puzzling objections were asserted.  What remains

5    outstanding, Mr. Campbell?

6             MR. G. CAMPBELL:  Just acceptance, Your Honor.

7             THE COURT:  All right.  And, Mr. Campbell, tell me why

8    I should grant the defendant acceptance of responsibility when

9    eight objections were asserted, some of which undermined the --

10   not only the stipulation of facts into which the defendant

11   entered as a part of his plea agreement, but also the statement

12   for acceptance of responsibility submitted by you?  You objected

13   to your own statement.

14            MR. G. CAMPBELL:  Well, Your Honor, the answer to the

15   first part of your question is because I wrote it badly.  I tried

16   to take the stipulation of facts that had the government's best

17   foot forward on it and put our best forward on it, foot forward.

18       For instance, there was something that said that votes were

19   illegally cast and I said, well, no, they weren't illegally cast

20   and I do stand by that statement, Judge, but the problem with the

21   votes were, although the voters had no criminal intent or

22   anything else, the applications upon which those ballots went out

23   were, in fact, not properly prepared.

24            THE COURT:  And your position is that even if an

25   absentee ballot application is prepared illegally and

```
 1    fraudulently, that that vote can nonetheless be cast legally?
 2              MR. G. CAMPBELL:  No, sir.  Well, I don't think that --
 3              THE COURT:  That seems to be what you just said.
 4              MR. G. CAMPBELL:  I don't think that any of the people
 5    that cast their ballots, people whose applications had been
 6    filled out, knew that they were doing something wrong.  That was
 7    my point.  I don't think the people that actually voted said,
 8    "Here I go.  I've got an illegal application.  This is an illegal
 9    vote and I'm going to vote it anyhow".
10              THE COURT:  Well, that's different than whether or not
11    the vote was cast legally.
12              MR. G. CAMPBELL:  Yes, sir, and, as I say, when I wrote
13    it, I did not write it clearly, but that's what I meant when I
14    went through the Presentence Report.
15              THE COURT:  Well, all right, but let's go back to my
16    original question then.
17              MR. G. CAMPBELL:  All right.
18              THE COURT:  You asserted objections which undermined
19    the stipulation of facts, in addition to the acceptance of
20    responsibility statement that you submitted.  Now my
21    understanding is you're withdrawing those objections.
22              MR. G. CAMPBELL:  Yes, sir.  Yes, sir.  We had -- Mr.
23    Ruby, Agent Berry, Mr. Ramey, and I met for well over an hour and
24    went through that stipulation of facts and what I had responded
25    in my letter to Ms. Cueva, and I think to the satisfaction, at
```

1    least, to the government, I explained what our position was and

2    followed up with a letter to Ms. Cueva.

3           THE COURT:  All right.  So among the other objection

4    you asserted was an objection to the statement contained in the

5    Presentence Report that this defendant participated in a

6    conspiracy with Mr. Bowman and Mr. Whitten to procure these

7    absentee ballot applications unlawfully.

8           MR. G. CAMPBELL:  That's true.

9           THE COURT:  And you are withdrawing your objection to

10    that statement in the Presentence Report?

11           MR. G. CAMPBELL:  It is our position now, Judge, and

12    has been from the beginning, that Mr. Ramey was not part of a

13    conspiracy with Mr. Whitten and Mr. Bowman to violate any voting

14    laws in Lincoln County.

15           THE COURT:  Of Lincoln County?

16           MR. G. CAMPBELL:  And -- well, in this election.

17           THE COURT:  How about the laws of the State of West

18    Virginia?

19           MR. G. CAMPBELL:  And the laws of the State of West

20    Virginia, certainly, sir, and I'm willing to tell you why I think

21    that.

22           THE COURT:  I'm interested to hear that.

23           MR. G. CAMPBELL:  All right.

24           THE COURT:  Because I'm -- after everything I've heard

25    in this case, I'm pretty skeptical --

1          MR. G. CAMPBELL:  Okay.

2          THE COURT:  -- of this notion.

3          MR. G. CAMPBELL:  Your Honor, I got appointed in this

4   case on Monday, January the 30th.  On Tuesday, the 31st, I had

5   Mr. Ramey come to my office.  I had also talked to Mr. Ruby the

6   day before, telling him I had been appointed, and that I was in

7   the case.

8      On February the 3rd, which is three days after my

9   appointment, four days after my appointment, I was contacted by

10  Mr. Ruby and Mr. Goodwin and, at that time, they proposed or told

11  me that they would extend to Mr. Ramey a plea to a 241

12  conspiracy, and my notes indicate that they told me that the base

13  offense level is 12.  If he got two off for acceptance, that's an

14  offense level of 10 and the guideline was 6 to 12 months.

15     Now, as their memorandum points out, Mr. Bowman and Mr.

16  Whitten have already been in.  So it's true, he's last, but I

17  didn't get appointed until after they were in, but anyhow, Judge,

18  they said, "This is your -- you're looking at a base offense

19  level of 10, 6 to 12 months.  If you can give us information on

20  others, there's a possibility of a motion.  You probably won't

21  pull time".

22     I bring Mr. Ramey in.  I called -- I called the government

23  back and said, "We don't have a factual basis for the plea" and,

24  Judge, that was our position for months and, finally -- and we

25  prepared for trial.

Judge, I called up the court administrator.  I called up Judge Stanley, said, "We're -- this is a target letter.  This comes under 'other'.  I'm going to far exceed that.  Can I go ahead and prepare for trial?"  They said yes, and that's exactly what we did, hired an investigator, went out, interviewed witnesses, got ready to go to trial and, all along, our position was no conspiracy.

When we met with them, Judge, four or five days after my appointment, Mr. Ramey told them everything.  He told them everything.  What he -- what he did tell them was, is that there were absentee ballot applications that were marked retroactively and he didn't know how that had been done or who did it and he lied.  That's the false statement.

We're still in negotiations.  I'm still telling them we do not have a factual basis to enter a plea.  They come to me and say, "How about a false statement"?  I talk to Mr. Ramey.

Now I understand -- I was in Alaska when Mr. Bowman got sentenced, but I have read the transcript.  Mr. Bowman didn't cause Mr. Ramey to come in.  Mr. Ramey and I are the only two people that know what caused him to come in, and what caused him to come in was the fact that Mr. Bowman had been sentenced on the -- or had been charged with a conspiracy.  Mr. Whitten was in and we did not know how fruitful the mind of the government could be if they drafted an indictment against Mr. Ramey.

So we sat down and talked about it long and hard and Mr.

Ramey decided that, discretion being the better part of valor, we had a factual basis for the false statement and took it. So that's the history of how it goes and, Judge, that's why our assertion has been from day one that there's no factual basis for the plea for him to enter to a conspiracy.

While we were preparing for sentencing, Judge, something came up about a statement that Mr. Bowman had made. Well, I didn't have that statement, so the government provided me with a 302 that Mr. Bowman gave and I'm told this is the only statement that they have from him and, Judge, nowhere in that 302, as far as I can tell, does Mr. Bowman say that Mr. Ramey is in a conspiracy.

I do know that Mr. Whitten says that Mr. Ramey came up with the idea. Mr. Bowman doesn't say that anywhere that I'm aware of. Mr. Bowman says that they met and they had an agreement to utilize the absentee ballot process and that's exactly right, Judge. That's exactly right. They did have an agreement to utilize the absentee voting process, but Mr. Ramey did not have any kind of agreement at all to break the law.

Judge, in my reading of Mr. Bowman's 302, it says -- and as far as I know, it has never been disputed by the government, but it says that two weeks prior to the election, in May of 2010, two weeks prior to the election, that Mr. Bowman sat down and read the Code. He had attempted to read the Code earlier and, according to the 302, Mr. Whitten came in and said, "You don't

need to read that Code.  We're doing all right".

Two weeks before the election, Mr. Bowman, in his 302 -- and the government has made a motion for him -- came to the determination that he had been -- by following the instructions of Donald Whitten, that he had broken the law and the 302 indicates that, once he read that, that he went home and never campaigned again for the last two weeks.  Now that's just what I'm getting, Judge, from information that the government gives me.

So I've got Mr. Bowman saying that Mr. Whitten has told them consistently that they would be okay on these absentee ballot applications, as long as they marked a 1 or a 7.  I have read grand jury transcripts given to me by the government where they have had witnesses -- or at least one.  I've only gotten the one, Judge, of Ms. Frazier, where she says, "Well, we were out there doing the absentee ballot process.  I didn't know it was wrong. I thought it was right".

Judge, the government in their brief says it's hard to understand how an educated man like Mr. Ramey could not know, but the government has witnesses that have testified that they didn't know.  I've got Mr. -- I've got Mr. Bowman, at least in the 302, he indicates a lot of things, but he doesn't indicate that Mr. Ramey was a part of the conspiracy.

So, I mean, Judge, I don't want to affront the Court.  I don't want to get my client in any more trouble than what he's

1    in, but the reason from day one we have told them we have no

2    factual basis for the conspiracy plea and that's simply where he

3    stands today, Judge, and the information that I'm arguing to you,

4    I have, but that's his position.

5         Oh, and I guess while I'm here, the question, of course, is

6    he an honest man or not?  I've got a hundred people or so behind

7    me saying that he is.  It's not -- it's unlike his character to

8    do something like this.

9         The Court has received letters.  I know there were around 88

10   or something, but I sent in a batch of 20 because you told me you

11   would read 20 and, in some of those letters, those people have

12   indicated they had voted absentee in earlier elections, Judge,

13   and thought it was proper to do so.

14        And I also understand your concern about the forms, but you

15   also know that there's a West Virginia Code section that speaks

16   of absentee ballots and says that you're required to mark "the

17   reason, (comma), if any, (comma), that you can't vote".  That's

18   not on the application, I understand that, but that is at least a

19   confusing aspect of it.

20        But, Judge, I can't -- other than to tell you the history,

21   to put his credibility in issue, it's our position, it's Mr.

22   Ramey's position, that he was never part of an agreement to

23   commit a crime and that would be -- and those are the elements of

24   a conspiracy.

25                THE COURT:  What's the government say?

1    MR. RUBY:  Your Honor, I'll say first that even if --

2  and, as the Court is aware from the government's sentencing

3  memorandum, the government doesn't buy the argument that Mr.

4  Ramey was unaware or that he had no inkling whatsoever that there

5  was a problem -- a problem, excuse me, Your Honor, with

6  falsifying close to a hundred forms to -- that were for the

7  purpose of voting in an election.

8    He was an elected official himself.  He had been part of --

9  in and around the electoral process for a number of years and

10  whether or not -- and it's not whether or not he knew the details

11  of the absentee voting laws at the time he completed the forms,

12  there's, I think, certainly by a preponderance of the evidence

13  and I think even beyond a reasonable doubt, Your Honor, there's

14  evidence to establish that the defendant at least must have had

15  -- must have had an understanding that there was a problem with

16  falsifying the forms.

17    THE COURT:  Mr. Ruby, before you go on, do you happen

18  to have one of the forms that was utilized in 2010?

19    MR. RUBY:  I do, Your Honor.

20    THE COURT:  May I see that?

21    MR. RUBY:  Yes, Your Honor.

22    THE COURT:  You should show it to counsel first.  I was

23  on the Secretary of State's website today and looked at the form

24  that's current, but it has been updated since 2010.  So I'd like

25  to see what one of the forms looked like then.

1          MR. RUBY:  This version, Your Honor, I thought you

2     might want to look at it today.

3          THE COURT:  Hang on just a second.  Let me take a quick

4     look at it.

5          MR. RUBY:  Yes, Your Honor.

6        (Pause.)

7          THE COURT:  Any objection to this being placed in the

8     record?

9          MR. G. CAMPBELL:  No, Your Honor.

10          MR. RUBY:  No, Your Honor.

11          THE COURT:  All right.  I'm sorry, Mr. Ruby.  You may

12     proceed.

13          MR. RUBY:  No, Your Honor.  I was just going to

14     indicate for the record that in anticipation that you might want

15     to take a look at this today, I prepared one with the name of the

16     voter, the date of birth, and the address redacted.

17          THE COURT:  I see that, and I was much more interested

18     in what the form said, which is, as I'm sure you can comment on

19     more broadly, is really pretty clear.

20          MR. RUBY:  Yes, Your Honor.  As the government pointed

21     out in its sentencing memo, the form says in bold type, "I

22     understand that I must vote in person, if I can, and I do hereby

23     certify the information given is true to the best of my

24     knowledge".

25        The form also says further up in the space to indicate the

reason for eligibility to vote absentee, "I am requesting an
absentee ballot for the following reason:  I am not able to vote
in person during the early voting period and on Election Day
because", and then, of course, there's a list of reasons from
which the voter can choose.

The defendant has stipulated in the stipulation of facts
that he and Mr. Bowman and Mr. Whitten agreed to mark absentee
ballot applications to indicate that the voter was unable to vote
in person, either because of travel or employment, and this is
important.  The stipulation -- the stipulation that the defendant
has agreed to says that they were going to do that, that they
agreed to do that, regardless of whether those reasons were true.

THE COURT:  Now, and Mr. Bowman pled guilty to that
conspiracy, did he not?

MR. RUBY:  He did, Your Honor.

THE COURT:  And is -- as you're probably aware, Mr.
Ruby, there are certain federal crimes and, in my experience,
those are limited to a very particular species in a tax case
where the government must prove that the defendant knew what he
was doing was against the law and, in all other cases, ignorance
of the law is no excuse.  Is that your understanding?

MR. RUBY:  That's correct, Your Honor, and this is --
or the relevant conduct that's at issue here, the defendant's
involvement in the conspiracy, is a general intent crime.
There's no requirement of the kind of specific intent that is

1    called for in certain tax cases, as the Court says.

2        I'll also point out, Your Honor, that even if, even if we

3    accepted the defendant's statement that he didn't have the

4    necessary intent to be part of a conspiracy until shortly before

5    the election, the conspiracy to deprive voters of their rights

6    was ongoing at the time the defendant, by his own admission,

7    caused evidence to be altered.

8        So, at that point, when he caused evidence to be altered, he

9    himself took an overt act, performed an overt act in furtherance

10   of the conspiracy, and had certainly, at least by that point,

11   breached the necessary mutual understanding with Mr. Bowman and

12   Mr. Whitten that something -- something criminal was being done.

13       So even if, even if the Court were to credit the defendant's

14   contention about his mental state in the months leading up to the

15   election, he joined the conspiracy at least by the time he made

16   the decision to cause evidence to be altered.

17            THE COURT:  So let's get back to the original

18   objection.  What's the government's position on acceptance of

19   responsibility at this point?

20            MR. RUBY:  Your Honor, the government thought long and

21   hard about the question of acceptance of responsibility after

22   meeting with the defendant and with defense counsel.  The

23   objections -- as I understand it, the objection other than the

24   one we're discussing right now, that is the question of

25   conspiracy, has been withdrawn, and the -- I will say --

1          THE COURT:  Well, actually, my understanding is, and we

2     may need to get Mr. Campbell to clarify this, that he has

3     withdrawn all of his objections, except the objection to the

4     probation officer's failure to give a reduction for acceptance of

5     responsibility.

6          Am I correct about that, Mr. Campbell?

7          MR. G. CAMPBELL:  Yes, sir.

8          MR. RUBY:  Very well, Your Honor.  The question really

9     is whether the defendant's denial of his participation in the

10    conspiracy constitutes a frivolous denial of relevant conduct

11    and, given the weight of the evidence, I have to say it is at

12    least very, very close to that.

13         However, given the fact that the defendant did plead guilty,

14    did resign from his office, which are also listed in the

15    Application Note for the acceptance guidelines as factors to be

16    considered, we have made the decision that we're not -- we won't

17    object to -- we won't object to credit for the defendant for

18    acceptance of responsibility.  I'm not sure that -- well, I am

19    not prepared to argue that the Court should give that credit, but

20    I think, certainly, it would be within the Court's discretion to

21    do it based upon the Application Note in the guideline.

22         THE COURT:  Mr. Campbell, anything further?

23         MR. G. CAMPBELL:  Yes, sir.  In the first days of my

24    representation that I explained to you earlier, the government

25    sent me a case, which I can't put my hand on right now.  It was

1    out of Virginia.  It might have been *Cheek v. United States*, I'm

2    not sure.  Mr. Ruby sent it to me to show that absentee voting

3    violations can be the basis for a 241 conspiracy.  The case also

4    held that it was a specific intent crime and that the government

5    -- because I called him up and thanked him for the case -- and

6    that the government would have to prove beyond a reasonable doubt

7    that he, in fact, had knowledge it was a crime, intended to do

8    it, and did it.

9        Judge, it's a whole lot harder to defend a conspiracy charge

10   when the burden is a preponderance rather than beyond a

11   reasonable doubt.  I cannot tell you why the government did what

12   they did or what their decision process was then, but I do know

13   that it was our position all along and -- and I can tell the

14   Court is not real happy with it, but it was our decision all

15   along, it was our information all along, that there was no

16   factual basis for the plea and that's -- Judge, that's still

17   exactly where we are.

18       If you are talking conspiracies, what's the government do

19   when -- when it says that Mr. Bowman -- apparently, if there was

20   a conspiracy Mr. Bowman was in, he withdrew from it two weeks

21   before the election and Mr. Ramey's activities occurred

22   subsequent to that, his activities being his encounter with Ms.

23   Topping, the absentee applications being given reasons, and his

24   lying to the agents about that.  This all came after Bowman had

25   -- if you are talking a conspiracy, and I'm not, but he withdraw

1  from -- withdrew from it, if there was one.

2      But, Judge, I only know what the government gives me and

3  what the government gave to Mr. Bowman, he doesn't say -- he --

4  he says that he, Whitten, and Mr. Ramey had an agreement

5  concerning absentee ballots.  He -- he never puts Mr. Ramey in

6  that conspiracy.  He talks twice about Mr. Whitten telling him

7  not to read the Code.

8      You have Donald Whitten, who for over 20 years was Clerk,

9  never went to a training session in his life; you have Sheriff

10  Bowman, who was active in politics for years; and you have a

11  letter from a Mr. Linville, one of Mr. Bowman's friends, saying

12  that Bowman told him, "Well, we're going to back Thomas Ramey.

13  You don't know who he is, but he's as green as a gourd".  You

14  have those letters.  I sent them to you and I would just ask you

15  to consider those.

16          THE COURT:  All right.  First of all, the defendant is

17  not charged with a conspiracy.  He is charged with lying to an

18  FBI agent and he has pled guilty to that.  However, that is part

19  of a bigger story in this case and whether or not legally there

20  is a conspiracy, and I have so found with regard to Mr. Bowman,

21  and it is -- it is the very same conspiracy we're discussing.

22      Whether or not legally there's a conspiracy, any assertion

23  that this defendant was not involved in the election fraud

24  involving these absentee ballots, especially when you look at the

25  form, is not credible to me.  So now there's a separate legal

1    question of whether or not this is relevant conduct and nobody

2    has really argued this and I don't really see the need to dive

3    into it because the government is taking the position that it has

4    no objection to the defendant receiving a reduction for

5    acceptance of responsibility.

6         If, as Mr. Campbell has suggested, the defendant is standing

7    by the factual basis for the plea set forth in the stipulation of

8    facts, then in spite of this backpedaling that I saw in these

9    objections and in the letters, and I'll talk about that after

10   while, I think the defendant has done the bear minimum necessary

11   to receive a reduction for acceptance of responsibility.

12        I would add that that reduction likely is not going to have

13   a tremendous impact one way or the other in my sentencing

14   decision.  I also believe that I can consider -- you know, I've

15   been doing this long enough to know when I see minimization and

16   when I see backpedaling, whether it affects acceptance of

17   responsibility or not, and it is certainly something I can

18   consider in connection with the very broad 3553(a) factors.

19        So the ruling, though, on the acceptance of responsibility

20   is that I will sustain the objection and grant the -- a two-level

21   reduction for acceptance of responsibility and I will ask Ms.

22   Cueva to prepare a brief addendum to the Presentence Report to

23   that effect.

24        Moving on, I would note that I have received sentencing

25   memoranda from both sides.  I have received somewhere in the

neighborhood of 30 letters.

Mr. Campbell, I know that you're familiar with my policy on letters. I did read the first 20, and some of them were duplicative, but I believe I have a count of a total of 30 letters. Do you wish that those be made a part of the record?

MR. G. CAMPBELL: Yes, Your Honor.

THE COURT: Any objection?

MR. RUBY: No, Your Honor.

THE COURT: All right. I will so order that.

I want to say this, too, about the letters. The letters are interesting and normally, at this stage in the hearing, I go through the perfunctory exercise that you've just seen where I ask if there's any objection, I put them in the record, we move on, and probably nobody ever looks at them ever again. However, I would encourage members of the public and the media to look at these letters. They are interesting and I think that they would be worth the effort to take a look at, at some point.

Now, on August 8th, 2012, the defendant appeared before this Court and entered a plea of guilty to a single-count information charging him with making a false statement in violation of 18 U. S. C. Section 1001.

I will now adjudge the defendant guilty of that crime and accept the plea agreement that was previously filed.

I'm now ready to give my tentative findings as to the applicable guidelines. I find a total offense level of 4.

1    That's a base offense level of 6, minus 2 for acceptance of

2    responsibility; a criminal history category of I, based on 0

3    criminal history points, yielding an imprisonment range of 0 to

4    6 months, which is in Zone A of the sentencing table, which

5    allows for, among other things, straight probation; 1 to 3

6    (sic) years of supervised release -- actually, 1 to 5 years of

7    probation; a fine range of $250.00 to $5,000.00; and a mandatory

8    special assessment of $100.00.

9        Are there any legal objections to my tentative findings as

10   to the applicable guidelines?

11            MR. RUBY:  No, Your Honor.

12            MR. G. CAMPBELL:  No, Your Honor.

13            THE COURT:  All right.  Very well.

14   Mr. Ramey, at this time, the Federal Rules of Criminal

15   Procedure give you the right to make any statement that you would

16   like to make, although you're not obligated to make any

17   statement.  However, if you do choose to make a statement, I

18   would ask that you stand to do so.

19            THE DEFENDANT:  Thank you, Your Honor.  I would just,

20   at this point, like to apologize to my family, my friends, and

21   the people of Lincoln County.  As I was growing up, I was always

22   really interested in public government and also just non-profits

23   and helping people and it was always very hurtful to me to know

24   that Lincoln County was a place that had so much negative

25   attention and I always, from a young age, strived to try to do

what I could to make it a better place and that's one of the
reasons why I decided to get in public office and run for school
board and try to save small schools and try to instill a sense of
pride in the people that live in small rural areas and rural
places like Lincoln County and I love Lincoln County.  I love the
people there.

I -- never did I want to end up being in a position where I
would cause negative attention and the negative connotations that
are apparent toward Lincoln County and, for that, I'm ashamed and
for the crime that I did commit, I'm very sorry and remorseful
and would never, never do that again.

I just want to -- want the Court to understand the position
that I was in.  I was appointed to the County Commission in
November.  I had never had any type of formal relationship, not
even a hello relationship with Jerry Bowman or Donald Whitten.
Didn't know anyone at the courthouse, for the most part.  I was
an activist that, actually, most of them tried to stay away from.

I would attend community meetings and the people in the
communities would call me.  I helped people do a wide array of
different things because they trusted me and, when I was able to
get on the County Commission after being involved in social
justice work and grass-roots work, when Donald Whitten and Jerry
Bowman told me that absentee voting was no excuse, this is a way
that you can really go out and get those people that can't get to
the polls and the people that don't want to vote, this is a way

1    to get to them, I thought it was great.

2         I was proud of what I was doing the entire time.  I was so

3    proud of it that I went to all the meetings that I would attend

4    across the state and talked about it, told people carrying

5    absentee applications with them it was no excuse and, when I

6    questioned the applications, I never formally sat down and read

7    it to understand it, but Donald Whitten always said, "Well, the

8    Secretary of State's Office never has their paperwork straight.

9    That's just a form for us to file and to keep it filed, that's

10   all it is", Donald said, and he went across the state -- I mean

11   across the county, in Lincoln County, and every single event we

12   had, he would say the same thing.  He would openly talk about how

13   absentees were no excuse.  People truly thought the process was

14   no excuse, as long as, he would say, as long as they vote one

15   time.

16        Where I messed up, and where I'm ashamed, is after I was

17   working myself as hard as I can -- could to get people to be able

18   to vote and when it was brought to my attention that I was lied

19   to and used and, as some people laugh and say, I was their

20   puppet, I panicked, and I went to the County Clerk's Office and,

21   because of what I did, a girl that I've known my entire life went

22   back and marked some of the applications that had already been

23   marked and I -- I know that she would not have done that if I

24   hadn't went to her and it wasn't because I was the County

25   Commissioner.  It wasn't because I was in any kind of position.

1    It was because I had known her my whole life.

2        And the reason that my application didn't have reasons

3    marked was that Donald and Jerry kept saying, "Mark 1 or 7".

4    Well, to me, if you didn't have to have a reason, there was no

5    excuse.  I just didn't mark a reason.  I didn't think you should

6    mark a reason, but at the end, I panicked, and then when I was

7    asked about it, I was too scared to admit it, and that is --

8    that's something that I take full responsibility for.

9        But I just hope the Court recognizes and believes that I

10   never, never agreed to be a part of a conspiracy, never agreed to

11   do anything illegal and, actually, if they would have ever

12   implied something illegal, I would have never even been their

13   friend or campaigned with them and I'm ashamed, because the very

14   process that I was so proud of, the electoral process that I

15   tried to help strengthen by helping make sure people could vote,

16   I interfered with that when I had her retroactively mark those

17   applications and, for that, I'm sorry, and I take full

18   responsibility.

19           THE COURT:  Thank you, sir.  You may be seated.

20       Mr. Campbell, anything else on behalf of the defendant

21   before I impose sentence?

22           MR. G. CAMPBELL:  No, Your Honor.

23           THE COURT:  Mr. Ruby?

24           MR. RUBY:  Your Honor, in a case like this, I think

25   it's incumbent on the United States to say a few words about the

importance of democracy and why the things that the defendant and his co-conspirators did were so dangerous.  Our democracy, at its heart, depends on a set of unspoken promises that we make to each other.  We promise that we're going to choose our government based on majority rule and, when we have an election, we might argue our position with passion and with fervor, but when it's time to count the votes, there is a mutual agreement that democracy depends on that the votes are going to be counted honestly and that we're going to abide by the decision of the majority whether we like it or not.  Now that system only works if we can trust each other to play by the rules.

When elections are rigged, it destroys that trust and it robs people of confidence in everything that their government does and, certainly, there are a lot of folks in Lincoln County that we've talked to in the course of this investigation who are -- who are disillusioned and disgusted and are ashamed of the things that their elected officials have done in this election and in elections past.

The Court noted when it sentenced the defendant's co-conspirators correctly that there are parts of Southern West Virginia that have suffered from election fraud for decades.  Past prosecutions don't seem to have sent a strong enough message and a stiff sentence here, along with the sentences that the Court imposed for the defendant's co-conspirators, is a big step and it's a necessary step toward the goal of honest elections in

1    Lincoln County.

2         There are a few things, Your Honor -- and this is pointed

3    out in the sentencing memo -- there are a few things about this

4    defendant specifically that are important to note.

5         First, he was the last of the group of conspirators to tell

6    the truth and to cooperate with our investigation.  His

7    co-conspirators, because they cooperated earlier in the

8    investigation, were able to -- were able to assist us and the

9    defendant was not.

10        Now I know Mr. Campbell said earlier that Mr. Bowman didn't

11   play any role in Mr. Ramey's decision to plead guilty.  I'm

12   obviously not privy to the discussions that Mr. Campbell and his

13   client have, but certainly, it's the -- I can tell the Court that

14   the sequence of events were that Mr. Bowman gave information

15   about Mr. Ramey's involvement in the conspiracy and that

16   information and the fact that Mr. Bowman was ready and willing to

17   testify against the defendant were conveyed to defense counsel

18   and the defendant -- the defendant decided to plead guilty.

19   Because of the position that he put himself in by delaying, he

20   wasn't able to provide us with any assistance of that nature.

21        Second, the defendant is the only one in the group of

22   conspirators, to the government's knowledge, who altered evidence

23   to try to conceal the conduct the conspirators were engaged in.

24        The third point I would make, and this is also in the

25   memorandum, the defendant's false statement stands out because it

was gratuitous.  We didn't -- the FBI didn't and our office

didn't know anything about altered absentee ballot applications

until the defendant himself raised the issue with a false story

about how the applications were altered for the express purpose

of lying to us about it and trying to suggest that Mr. Whitten or

somebody in his office was to blame for those applications being

altered.

And the last point I'd make, Your Honor, is that the

defendant didn't correct his false statement quickly.  He lied to

the FBI back in February.  As Mr. Campbell set this timeline, he

let the lie stand until the middle of the summer when he was

facing imminent charges.  Those are all differences that we

believe the Court ought take into account as it sentences this

defendant.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Ruby.

Before I -- I meant to address this earlier.  I received

three letters that were not in favor of the defendant.  Those

have been provided to counsel, I believe.  You all have received

those?

MR. RUBY:  Yes, Your Honor.

MR. G. CAMPBELL:  Yes, sir.

THE COURT:  Is there any objection to me placing those

in the record?

MR. RUBY:  No, Your Honor.

MR. G. CAMPBELL:  We have no objection.

1          THE COURT:  All right.  That will also be so ordered.

2        All right.  After consideration of the advisory guidelines

3    and the other applicable factors under Section 3553(a) of Title

4    18 United States Code, I am now ready to impose sentence.

5        Will the defendant please stand?

6        Mr. Ramey, I gathered from everything I reviewed, including

7    the letters, that you may very well have started out in, first,

8    community issues or issues of public concern and, later, in

9    politics as an idealistic young man trying to make a difference

10   in issues that you saw were important to your community and

11   that's a great thing.  Idealistic youth, fresh, new, eager faces

12   are probably what most renews the public's interest and

13   enthusiasm for politics and public service from time to time,

14   especially when we're all tempted to become disgusted or

15   disenchanted with politics and, yet, your idealism apparently

16   yielded to corruption at some point.

17        Now you, I imagine, had, at some point, some political

18   mentors, people who had more experience than you, who took you

19   under their wings and guided and promoted you as a young man in

20   politics.  If there were such people, I don't know who they were,

21   but if there are such people, and they're officeholders, I hope

22   the people of Lincoln County will also hold them accountable for

23   the environment you found yourself in or, for the very least, for

24   not teaching you better.

25        Now, having said all of that, youth and being new to

1    politics are no excuse for this sort of activity.  I, too, was

2    once a young man getting involved in politics.  It was exciting.

3    It was interesting.  It was an opportunity to serve.  It was an

4    opportunity to advance ideas that I believed in.  I was

5    idealistic as well, but even though I was young and new to

6    politics, I certainly understood that it was wrong to try to

7    cheat in an election, to try to falsify election documents, or to

8    lie to the FBI about it.  Regardless of who may have influenced

9    you, you are solely accountable for your actions.

10       I note that you have, in my estimation, been the least

11   cooperative of the three defendants and, certainly, the last to

12   cooperate.

13       Now in the letters, you did indeed have a lot of people who

14   were willing to say kind things about you and I have no doubt

15   that before all of this happened, and maybe even after, you did

16   some good things.  I could say the same thing about the other two

17   defendants and, in fact, I did, but that's not what's at issue

18   here.

19       Also, there's a consistent theme in the 20 letters that I

20   read.  It's not in all of them, but it's in most of them, and

21   that is this business that you believed that absentee ballots

22   were -- could be -- applications could be submitted and absentee

23   ballots voted for no excuse at all; in other words, a

24   justification for it didn't have to be given.  I recognize a

25   campaign when I see one.  It is remarkable that so many of these

letters include passages that were merely identical on those points.

Further, I find it incredible, especially now that I have seen the form, that you could be so incorrect about the law, but even if you were, ignorance of the law is no excuse and, in particular, as a candidate before for the Board of Education and, in 2010, as a candidate for County Commissioner and, perhaps most importantly, as a member of the Board of Canvassers, you should have known better and you should have taken the time to educate yourself on election law and, although election law is complicated, it's not that complicated. It's not rocket science and these forms aren't that difficult to read.

That brings me to another point and that is your role on the Board of Canvassers. I find that to be perhaps the most significant distinction between your case and the other cases. The Board of Canvassers for this election was the County Commission on which you sat as a member and, yet, as the Board of Canvassers, you were a part of one of several institutions specifically given the task of ensuring that the election was free and fair and appropriately administered and in that, by the time you sat on the Board of Canvassers for this election, you failed miserably in that task.

Now, for everyone in this room from Lincoln County, whether you're a member of the media, an officeholder, or just a concerned citizen, whether you're here in support of the

1    defendant or not, this sentence that I'm about to give is meant

2    to send a message back to Lincoln County with you and it's a

3    message that I also stated in the Bowman and Whitten sentencings

4    and it's very simple.  Election fraud in Lincoln County and in

5    Southern West Virginia must stop.

6         Now, further, here's fair warning.  If these sentences don't

7    get the message across and election fraud cases are before me

8    again from Lincoln County or any of the other notorious counties,

9    I will conclude that even stronger sentences are necessary to

10   deter election fraud in West Virginia and preserve the integrity

11   of the will of the people expressed through their votes.

12        For all of these reasons, but especially, especially for the

13   factor of deterrence under Section 3553(a)(2)(B), it is the

14   judgment of this Court that the defendant be committed to the

15   custody of the Federal Bureau of Prisons for a period of

16   21 months.

17        Upon release from prison, the defendant shall be placed on

18   supervised release for a term of two years.  Within 72 hours of

19   release from custody, the defendant shall report in person to the

20   U. S. Probation Office in the district to which he is released.

21        While on supervise the release, you must not commit another

22   federal, state, or local crime; you must not possess a firearm or

23   other dangerous weapon; and you must not unlawfully possess a

24   controlled substance.

25        You also must comply with the standard terms and conditions

of supervised release as recommended by the U. S. Sentencing
Commission and as adopted by this Court, although you need not
participate in a program of testing, counseling and treatment for
drug and alcohol abuse.  I'm also not going to impose a -- I'm
going to waive the drug testing requirement.

I'm going to impose a fine of $1,000.00.  That will be made
due immediately, but it may be paid through the Inmate Financial
Responsibility Program at the rate of $25.00 per quarter.  Any
remaining balance, once you're released from prison, payment of
that will be a special condition of supervised release and it
must be paid within the first year of your supervised release.

A mandatory special assessment -- has the special assessment
been paid, Mr. Campbell?

MR. G. CAMPBELL:  Yes, sir.

THE COURT:  All right.  Very well.  So we don't need to
take care of that.

You may be seated.

Mr. Campbell, are there any recommendations that you or your
client would like for me to make to the Bureau of Prisons?

MR. G. CAMPBELL:  FCI Morgantown, Your Honor, if you
would, and I would move that he be allowed to self-report, if
that's possible.

THE COURT:  I will recommend that the defendant be
designated to FCI Morgantown.

Mr. Ruby, is there any objection to the defendant being

1 allowed to self-report?

2    MR. RUBY:  No, Your Honor.

3    THE COURT:  All right.  I will allow the defendant to

4 remain on his current bonding pending sentencing and I will

5 direct that he self-report as directed to the facility designated

6 by the Bureau of Prisons as directed by the United States Marshal

7 Service.

8  All right.  Mr. Ramey, there is a significant appeal waiver

9 contained in your plea agreement.  Subject to that waiver, you

10 have the right to appeal the judgment of this Court.  Any Notice

11 of Appeal must be filed with the Clerk not more than 14 days from

12 the date of the entry of the judgment order.

13  If you desire counsel on appeal and you are unable to retain

14 counsel, the appropriate Court will review a financial affidavit

15 filed by you to determine whether or not to appoint counsel.

16  Do you understand your right to appeal and the 14-day filing

17 requirement?

18    THE DEFENDANT:  Yes, Your Honor.

19    THE COURT:  All right.  I will place the Presentence

20 Report under seal subject to counsel's right to unseal as

21 necessary for appeal.

22  Any other matters that we need to take care of in this case?

23    MR. RUBY:  No, Your Honor.

24    MR. G. CAMPBELL:  No, sir.

25    THE COURT:  Mr. Campbell, my law clerk is pointing out

1  that there's -- docket 15 is a motion to travel.  I believe we

2  resolved that informally, did we not?

3           MR. G. CAMPBELL:  Yes, Your Honor.

4           THE COURT:  So can I deny that as moot?

5           MR. G. CAMPBELL:  Yes, sir.

6           THE COURT:  All right.  I will do that.

7      All right.  And, Mr. Campbell, you mentioned -- or were you

8  appointed in this case?

9           MR. G. CAMPBELL:  Yes, sir.

10          THE COURT:  All right.  Well, then I want to thank you

11  for your service not only to the defendant, but also to the

12  Court.

13          MR. G. CAMPBELL:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          (Proceedings concluded at 2:58 p.m., November 15, 2012.)

16

17  CERTIFICATION:

18      I, Ayme A. Cochran, Official Court Reporter, certify that

19  the foregoing is a correct transcript from the record of

20  proceedings in the matter of United States of America, Plaintiff

21  v. Thomas Ramey, Jr., Defendant, Criminal Action No.

22  2:12-cr-000154, as reported on November 15, 2012.

23

24  s/Ayme A. Cochran, RPR, CRR                    August 29, 2013

25  Ayme A. Cochran, RPR, CRR                      DATE